# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT



U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2007 AUG 10 A II: 49

**In Case No. 2006-0751, <u>Christine C. Eng Khabbaz & a. v. Commissioner of Social Security</u>, the court on August 9, 2007, issued the following order:**

Siobhan K. Madison's application for admission *pro hac vice* on behalf of the defendant, Michael J. Astrue, Commissioner of Social Security, is granted.

This order is entered by a single justice (Hicks, J.). See Rule 21(7).

**Eileen Fox,**
**Clerk**

Distribution:
Siobhan K. Madison, Esquire
Timothy G. Kerrigan, Esquire
Preeya M. Noronha, Esquire
Nicholas J. Patterson, Esquire
David L. Broderick, Esquire
File

NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

U.S. District Court
No. 2006-751

CHRISTINE C. ENG KHABBAZ, BY AND THROUGH
HER MOTHER AND NEXT FRIEND, DONNA M. ENG

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION

Argued: May 9, 2007
Opinion Issued: August 9, 2007

Hamblett & Kerrigan, P.A., of Nashua (Timothy G. Kerrigan and Jennifer R. Schick on the brief, and Mr. Kerrigan orally), for the plaintiff.

United States Department of Justice, of Washington, D.C., (Nicholas J. Patterson and Richard G. Lepley on the brief, and Mr. Patterson orally), Peter D. Keisler, assistant attorney general, on the brief, Thomas P. Colantuono, United States Attorney (David L. Broderick, Assistant United States Attorney, on the brief), United States Social Security Administration (Karen J. Aviles and Nancy B. Salafia, attorneys, Office of General Counsel and Office of Program Law, on the brief), for the defendant.

DUGGAN, J. Pursuant to Supreme Court Rule 34, the United States District Court for the District of New Hampshire (Barbadoro, J.) certified the following question for our consideration:

> Is a child conceived after her father's death via artificial insemination eligible to inherit from her father as his surviving issue under New Hampshire intestacy law?

We respond in the negative.

The district court's order provides the following facts. Donna M. Eng and Rumzi Brian Khabbaz were married in September 1989 and, six years later, had a son together. In April 1997, Mr. Khabbaz was diagnosed with a terminal illness. Subsequently, he began to bank his sperm so that his wife could conceive a child through artificial insemination. He also executed a consent form indicating that the sperm could be used by his wife "to achieve a pregnancy" and that it was his "desire and intent to be legally recognized as the father of the child to the fullest extent allowable by law." Mr. Khabbaz died on May 23, 1998.

Christine C. Eng Khabbaz was conceived by artificial insemination after Mr. Khabbaz's death, using his banked sperm, and was born in the summer of 2000. At some point thereafter, she sought social security survivor's benefits. Under federal law, her eligibility for the benefits depends upon whether she can inherit from her father under state intestacy law. As the federal district court explained:

> [U]nder the Social Security Act (the "Act"), an individual who is the "child" of an insured wage earner and is dependent on the insured at the time of his death is entitled to child's insurance benefits. 42 U.S.C. § 402(d)(1). In determining "child" status, the Act instructs the Commissioner [to] . . . apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual was domiciled at the time of his death. Applicants who according to such law would have the same status relative to taking intestate personal property as a child of parent shall be deemed such. Thus, if Christine may inherit from Mr. Khabbaz as his surviving issue under New Hampshire intestacy law, she is considered to be the "child" of Mr. Khabbaz under the Act and is therefore entitled to child's insurance benefits.

(Quotation, citation, brackets and ellipses omitted.)

2

The Commissioner of the Social Security Administration (commissioner) denied Christine's application for survivor's benefits based upon an interpretation of RSA 561:1, our state's intestacy distribution statute. After a hearing, an administrative law judge upheld the commissioner's decision, and the Appeals Council of the Social Security Administration subsequently affirmed. Christine then appealed the commissioner's decision to the federal district court. Recognizing that this case raises an unresolved question of New Hampshire law, the district court certified the question to us.

Responding to the certified question requires us to interpret our state intestacy statutes. In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. Chase v. Ameriquest Mortgage Co., 155 N.H. \_\_\_, \_\_\_, 921 A.2d 369, 372 (2007). When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. Id. at \_\_\_, 921 A.2d at 372. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. at \_\_\_, 921 A.2d at 373.

RSA chapter 561 (2007) sets forth a comprehensive scheme for estate distribution. RSA 561:1, in particular, governs the devolution of the real and personal estate upon intestacy. RSA 561:1, I, prescribes the circumstances under which a surviving spouse may take from the estate. RSA 561:1, II, in turn, describes the procedure for distributing that portion of the intestate estate not passing to the surviving spouse. It provides:

> The part of the intestate estate not passing to the surviving spouse under paragraph I, or the entire intestate estate if there is no surviving spouse, passes as follows:
>
> (a) To the issue of the decedent equally if they are all of the same degree of kinship to the decedent, but if of unequal degree, then those of more remote degree take by representation.
>
> (b) If there are no surviving issue, to the decedent's parent or parents equally.
>
> (c) If there are no surviving issue or parent, to the brothers and sisters and the issue of each deceased brother or sister by representation; if there is no surviving brother or sister, the issue of brothers and sisters take equally if they are all of the same degree of

3

kinship to the decedent, but if of unequal degree then those of more remote degree take by representation.

(d) If there are no surviving issue, parent or issue of a parent but the decedent is survived by one or more grandparents, one half of the estate passes to the paternal grandparents if both survive or to the surviving paternal grandparent if one paternal grandparent is deceased and the other half passes to the maternal grandparents in the same manner; or if only one grandparent survives, such grandparent shall receive the entire estate.

(e) If there are no surviving issue, parent, issue of a parent, or grandparent but there are issue of the decedent's grandparent who survive, one half of the estate passes to the issue of the paternal grandparent who are not beyond the fourth degree of kinship to the decedent and said issue shall take equally if they are all of the same degree of kinship to the decedent, but if of unequal degree those of more remote degree take by representation, and the other half passes to the issue of the maternal grandparent who are not beyond the fourth degree of kinship and said issue shall take equally if they are all of the same degree of kinship to the decedent, but if of unequal degree those of more remote degree take by representation; provided, however, that if there are no issue of the decedent's grandparent within the fourth degree of kinship to the decedent on either the paternal or maternal side, the entire estate passes to the issue on the other side who are not beyond the fourth degree of kinship to the decedent and said issue shall take equally if they are all of the same degree of kinship to the decedent, but if of unequal degree those of more remote degree take by representation.

(f) No portion of a decedent's intestate estate shall pass to any person who is of the fifth or greater degree of kinship to the decedent.

(g) If there is no taker under the provisions of this section, the intestate estate passes to the state of New Hampshire.

Eng argues that her daughter is a "surviving issue" within the meaning of the statute. However, the plain meaning of the word "surviving" is "remaining alive or in existence." Webster's Third New International Dictionary 2303 (unabridged ed. 2002). In order to remain alive or in existence after her father passed away, Eng would necessarily have to have been "alive" or "in existence" at the time of his death. She was not. She was conceived more than a year after his death. It follows, therefore, that neither she nor any posthumously conceived child is a "surviving issue" within the plain meaning of the statute.

Alternatively, Eng contends that even if her daughter is not a "surviving issue," RSA 561:1, II(a) does not include the word "surviving," and therefore it applies to any "issue" – including posthumously conceived children. She argues that her position is buttressed by RSA 21:20 (2000), which defines "issue" as "includ[ing] all the lawful lineal descendants of the ancestor."

In isolation, the provisions cited by Eng might support her position. However, we do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme. Chase, 155 N.H. at ___, 921 A.2d at 373. Parts (b) through (e) of RSA 561:1, II all expressly reference "surviving issue" in describing the order of distribution. Thus, when viewed as a whole, RSA 561:1, II evinces a clear legislative intent to create an overall statutory scheme under which those who "survive" a decedent – that is, those who remain alive at the time of the decedent's death – may inherit in a timely and orderly fashion contingent upon who is alive. To hold that part (a) does not require the decedent's issue to "survive" would undermine the orderly distribution process clearly contemplated by the legislature. See id. at ___, 921 A.2d at 373 (when interpreting two or more statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes). Accordingly, when part (a) is interpreted in light of parts (b) through (e) and viewed within its larger statutory context, the absence of the word "surviving" in part (a) makes no difference in determining how the decedent's property is distributed.

RSA 21:20 does not compel a contrary result. RSA chapter 21 (2000 & Supp. 2006) sets forth general rules of statutory construction, including the definition of "issue" found at RSA 21:20. RSA 21:1 provides, however, that the definitions in RSA chapter 21 shall be observed in construing statutes "unless such construction would be inconsistent with the manifest intent of the legislature or repugnant to the context of the same statute." To conclude that RSA 21:20 broadens RSA 561:1, II(a) to include all issue – whether surviving or not – would undermine the finality and orderly distribution that the legislature clearly contemplated. After all, on a practical level, children may be conceived posthumously several years after an individual's death, and waiting for the

5

potential birth of a posthumously conceived child could tie up estate distributions indefinitely. Moreover, in terms of how the statutory scheme operates, requiring estates to wait for the potential birth of a posthumously conceived child would render meaningless the contingency scheme created by RSA 561:1, II(b) – II(e) because application of those parts is dependent upon a determination of the existence of "surviving issue," a determination that cannot be made if using a male's banked sperm any time after his death could create "issue" entitled to inherit under the statute. Accordingly, because application of the definition of "issue" in RSA 21:20 would be inconsistent with the manifest intent of the legislature and repugnant to the context of RSA 561:1, II, we do not apply it. RSA 21:1.

We also reject Eng's further argument that another statute, RSA 561:4, renders her daughter eligible to inherit under New Hampshire intestacy law. RSA 561:4 describes the inheritance rights of children born to unwed parents. It provides:

> I. A child born of unwed parents shall inherit from or through his mother as if born in lawful wedlock. The estate of a person born of unwed parents dying intestate and leaving no issue, nor husband, nor wife shall descend to the mother, and, if the mother is dead, through the line of the mother as if the person so dying were born in lawful wedlock.
>
> II. A child born of unwed parents shall inherit from or through his father as if born in lawful wedlock, under any of the following conditions:
>
> (a) Intermarriage of the parents after the birth of the child.
>
> (b) Acknowledgment of paternity or legitimation by the father.
>
> (c) A court decree adjudges the decedent to be the father before his death.
>
> (d) Paternity is established after the death of the father by clear and convincing evidence.
>
> (e) The decedent had adopted the child.

RSA 561:4.

6

Eng contends that Mr. Khabbaz's death ended the marriage, leaving Christine born to unwed parents and eligible to inherit from her father as long as she satisfied any of the conditions listed in RSA 561:4, II (a) – (e). We disagree. Viewed as a whole, RSA 561:4 evinces a clear legislative intent to establish a scheme of inheritance rights, upon intestacy, for illegitimate children. See N.H.S. Jour. 899 (1983) ("This [bill] would provide for an illegitimate child whose mother and father dies intestate, to be able to inherit from both the mother and the father."). If a man who was both a husband and a father died during the last few months of his wife's pregnancy, the parents would no longer be married; however, he and his wife would not be deemed "unwed" and no one would question the legitimacy of the child. The same must be true in the instant case. Although Christine's father died, her parents are not "unwed" for purposes of the statute, and she does not argue that she is illegitimate. To the contrary, she refers to herself as her father's "legitimate child." See RSA 168-B:7 (2002) (child created through artificial insemination is deemed legitimate). Accordingly, we reject Eng's contentions based upon RSA 561:4.

Eng also argues that RSA chapter 168-B (2002), a framework governing artificial insemination, in vitro fertilization, preembryo transfer and surrogacy, renders her daughter eligible to inherit from Mr. Khabbaz if he died intestate. RSA 168-B:9, entitled "Intestate and Testate Succession," provides:

> I. Subject to the provisions of paragraph II, a child shall be considered a child only of his or her parent or parents, and the parent or parents shall be considered the parent or parents of the child, as determined under RSA 168-B:2-5, for purposes of:
>
> (a) Intestate succession.
>
> (b) Taking against the will of any person.
>
> (c) Taking under the will of any person, unless such will otherwise provides.
>
> (d) Being entitled to any support or similar allowance during the administration of a parent's estate.
>
> II. For purposes of paragraph I, a child born of a surrogate is:
>
> (a) The child of the intended parents from the moment of the child's birth unless the surrogate gives

7

>    notice of her intent to keep the child pursuant to RSA
>    168-B:25, IV.
>
>    (b) The child of the surrogate and her husband, if
>    any, or if none, the person presumed to be the father
>    under RSA 168-B:3, I(d), from the moment of the
>    child's birth, if the surrogate gives notice of her intent
>    to keep the child pursuant to RSA 168-B:25, IV.

These provisions establish certain rights for children born by alternative means. However, nothing in the plain language of RSA 168-B:9 either affirmatively or implicitly modifies the requirement of RSA 561:1 that the issue who inherit upon intestacy must be "surviving." Moreover, to hold that RSA 168-B:9 creates a distribution scheme different from that created by RSA 561:1 would be inconsistent with our practice of construing statutes that deal with a similar subject matter so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose. Chase, 155 N.H. at ___, 921 A.2d at 373.

Eng also argues that the Uniform Simultaneous Death Act (USDA), RSA chapter 563 (2007), supports her position because "[t]here is no requirement under the USDA that the surviving individual be in existence, in gestation or in utero at the time of the death of the individual upon whose death the survivorship is based, only that they survive the decedent more than one hundred and twenty hours." In light of our discussion of "surviving issue" above, we reject this argument.

Finally, based essentially upon public policy considerations, Eng argues that we should adopt the reasoning of the Massachusetts Supreme Judicial Court in Woodward v. Commissioner of Social Security, 760 N.E.2d 257 (Mass. 2002). Woodward, however, is distinguishable because it is based upon Massachusetts statutes that differ from our own. Furthermore, to the extent Eng argues that public policy requires us to read RSA 561:1, II as allowing children who are posthumously conceived within a reasonable time after a parent's death to inherit, we agree with the special concurrence that "the intestacy statute . . . essentially leaves an entire class of posthumous[ly conceived] children unprotected." However, the present statute requires that result. To reach the opposite result and adopt the reasoning of Woodward would require us to add words to a statute, Chase, 155 N.H. at ___, 921 A.2d at 373. We reserve such matters of public policy for the legislature. State v. Kidder, 150 N.H. 600, 604 (2004). Other state legislatures have grappled with these issues, and we leave it to ours, if it chooses, to do the same. See, e.g., FLA. STAT. § 742.17(4) (2006); LA. ANN. STAT. § 9:391.1(A) (LexisNexis 2004); N.D. CENT. CODE §§ 14-18-04(2), 14-18-07 (2004); TEX. FAM. CODE ANN. § 160.707 (Vernon 2002); VA. CODE ANN. § 20-158(B) (LexisNexis 2004). As the

8

Massachusetts Supreme Judicial Court observed, reproductive technologies will grow and advance, and as they do,

> the number of children they produce will continue to multiply. So, too, will the complex moral, legal, social, and ethical questions that surround their birth. The questions present in this case cry out for lengthy, careful examination outside the adversary process, which can only address the specific circumstances of each controversy that presents itself. They demand a comprehensive response reflecting the considered will of the people.

Woodward, 760 N.E.2d at 272.

Accordingly, for the foregoing reasons, we answer the certified question in the negative.

Remanded.

DALIANIS, GALWAY and HICKS, JJ., concurred; BRODERICK, C.J., concurred specially.

BRODERICK, C.J., concurring specially. I join the majority's response to the certified question because I agree with its conclusion that a reasonable reading of RSA 561:1, coupled with the majority's recitation of the statute's purpose, establishes that Christine C. Eng Khabbaz is not the "surviving" issue of Rumzi Brian Khabbaz. I concur, however, with some reluctance. I feel particularly confined by our construction of the word "surviving," as I believe it frustrates a critical purpose of the statute, one different from that articulated in the majority opinion. I write separately to respectfully urge the legislature to examine, within the context of the state's intestacy statute, the confluence of new, ever-expanding birth technologies and the seemingly arcane language and presumptions attendant to the settlement of decedents' estates. I believe that with time and further technological advances, this confluence will engulf more and more of our state's families and the children produced as a consequence of such advances.

Pursuant to RSA 21:20, Christine is clearly the issue of Mr. Khabbaz ("The word 'issue,' as applied to the descent of estates, shall include all the lawful lineal descendants of the ancestor." (emphasis added)). Citing RSA 21:20, Christine's mother contends that RSA 561:1, II(a) includes her daughter as Mr. Khabbaz's issue. In response to this contention, the majority correctly notes that RSA 21:1 precludes the use of the statutory definition of "issue" in the construction of RSA 561:1, II(a) when such construction "would be inconsistent with the manifest intent of the legislature or repugnant to the

9

context of the same statute." The majority then concludes that including all "issue" under RSA 561:1, II(a) "would undermine the finality and orderly distribution that the legislature clearly contemplated."

While I agree that an expansive reading of "issue" within the context of RSA 561:1, II(a) could serve to delay the final settlement of intestate estates in some cases, I believe that it is important to recognize a critical purpose of the intestacy statute; that is, the protection of an intestate decedent's spouse and issue and the preservation of wealth for them, pursuant to principles of equity and equality. See, e.g., 23 Am. Jur. 2d Descent and Distribution § 4 (2002); see also Woodward v. Commissioner of Social Sec., 760 N.E.2d 257, 264-65 (Mass. 2002) ("[W]hether posthumously conceived genetic children may enjoy inheritance rights under the intestacy statute implicates three powerful State interests: the best interests of children, the State's interest in the orderly administration of estates, and the reproductive rights of the genetic parent."). This protective purpose has also been recognized by our probate observers. See 11 C. DeGrandpre, New Hampshire Practice, Probate Law and Procedure § 54-9, at 93 (3d. ed. 2001) ("[B]ecause the word 'issue' as used in the intestacy statute (RSA 561:1) has been statutorily defined to mean 'all lawful lineal descendants' of a decedent (RSA 21:20), after born children come within this broad definition and are protected and included as takers under the intestacy laws." (emphasis added)).

In rejecting the application of the definition of issue in RSA 21:20 to RSA 561:1, II(a), the majority notes that "on a practical level, children may be conceived posthumously several years after an individual's death, and waiting for the potential birth of a posthumously conceived child could tie up estate distributions indefinitely." While I agree that inordinate delay in the settlement of intestate estates would be against the intent of the legislature, I add two observations. First, RSA 561:1 may reasonably be read to already include an internal timeframe for the distribution of an intestate estate, beyond which a posthumous child, conceived either before or after the death of the parent, would not take. Specifically, the statute provides that:

> The real estate and personal estate of every person deceased, not devised or bequeathed . . . and personally remaining in the hands of the administrator on settlement of his or her account, shall descend or be distributed by decree of the probate court.

(Emphasis added.) As such, the statute could reasonably be read to provide for posthumous children to take their intestate share as "issue" when born before the final settlement of the administrator's account. Such a reading of the statute could serve to preserve the finality and orderly distribution of intestate estates contemplated by the legislature. Second, and more important, such a statutory construction would serve to protect posthumous children from taking

10

nothing under a statute intended, at least in part, to protect the issue of the intestate.

To construe the intestacy statute as we have done today essentially leaves an entire class of posthumous children unprotected under the intestacy statute. Such a result is undesirable, although seemingly required under the present statute. The resulting anomaly in our holding is underscored by the clear expression of the legislature's intent in two related statutes.

Within the context of wills, RSA 551:10 provides:

> Every child born after the decease of the testator, and every child or issue of a child of the deceased not named or referred to in his will, and who is not a devisee or legatee, shall be entitled to the same portion of the estate, real and personal, as he would be if the deceased were intestate.

The statute creates a rule of law, not merely a presumption, that pretermission is accidental, in order to prevent a mistake or unintended failure by the testator to remember the natural object of his or her bounty. In re Estate of Treloar, 151 N.H. 460, 462 (2004). The statute and its predecessors have served, for at least 185 years, to protect children, including posthumous children. See Eyre v. Storer, 37 N.H. 114, 122-23 (1858). Had Mr. Khabbaz executed a will, and neither mentioned nor referred to Christine, she presumably would take an intestate share of his estate, even if her taking would defeat other provisions of his will. Id. at 123 ("Being born after the death of her father, and in no way named or provided for in his will, she must have inherited all his property, as if he had died intestate; in other words, [his] will would have been wholly inoperative."). In the instant case, Mr. Khabbaz did not execute a will, but his intentions to have and to provide for his child were clear. Our reading of RSA 561:1, however, leaves Christine unprotected and ignores what we know to be his intent. See In re Estate of Kirkpatrick, 77 P.3d 404, 412 (Wyo. 2003) ("The general purpose of intestacy statutes is to distribute a decedent's estate upon their death in a pattern that would closely represent the distribution the decedent would have chosen had he manifested his intent through the use of a will.").

Far more recently, the legislature enacted RSA chapter 168-B, which comprises a statutory scheme that recognizes artificial insemination, in vitro fertilization, preembryo transfer, and surrogacy procedures. The statutory chapter became effective in 1991, prior to both the 1998 and 2003 legislative amendments to RSA 561:1. Our rules of statutory construction and our decision today lead to an apparently unintended result — that although assisted reproductive technologies are recognized and accepted under RSA chapter 168-B, a class of children who are the fruit of that technology will have

11

fewer rights and protections than other children when intestacy is involved. See Woodward, 760 N.E.2d at 265.

Finally, we have rejected Christine's mother's argument that we adopt the reasoning of the Supreme Judicial Court of Massachusetts in Woodward v. Commissioner of Social Security. While I agree that Woodward is distinguishable from the instant case because of a difference in our statutory schemes, that difference centers on a "posthumous children" provision in the Commonwealth's intestacy statute. Specifically, "[p]osthumous children shall be considered as living at the death of their parent." Mass. Gen. Laws Ann. ch. 190, § 8 (2004). The Massachusetts statute does not distinguish between those posthumous children conceived before, and those conceived after the death of the parent. In virtually all other respects, Woodward and the case at hand are the same.

The certified question from the United States District Court for the District of Massachusetts asked if a child conceived, through sperm banking and artificial insemination between a husband and wife, after the husband's death, was entitled to take under the Commonwealth's intestacy laws. Woodward, 760 N.E.2d at 259. The Supreme Judicial Court recognized that the posthumous children provision did not, on its face, limit the definition of posthumous children to those in utero at the time of the parent's death. Id. at 262. The court then looked to the purpose of the provision ("to preserve wealth for consanguineous descendants," id. at 264), and balanced the state interests of the best interests of children, the orderly administration of estates, and the reproductive rights of the genetic parent. Id. at 265-70. The court concluded that in certain limited circumstances, posthumously conceived children could take under the Commonwealth's intestacy statute. Those limited circumstances existed where a genetic relationship is demonstrated between the child and the decedent, and where the decedent affirmatively consented to both posthumous conception and the support of any resulting child. Id. at 259, 272. Even when such circumstances existed, however, the court noted that certain time limitations might preclude commencing a claim for succession rights on behalf of a posthumously conceived child. Id.

While I concur with the majority opinion, I respectfully urge the legislature to examine Woodward v. Commissioner of Social Security, the pertinent statutes of those states cited in the majority opinion, and the few other cases that have addressed related situations, in deciding the optimum course of action. See, e.g., In re Estate of Kolacy, 753 A.2d 1257 (N.J. Super. Ct. Ch. Div. 2000) (posthumously conceived children declared legal heirs of deceased parent under state's intestacy law in order to pursue survivor benefits with Social Security Administration). I believe that the parents of this state who avail themselves of the assisted reproductive technologies outlined in RSA chapter 168-B, the children produced through such technologies, the parents'

lineal descendants, and those charged with the administration of intestate estates deserve such legislative focus.